# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 17-16V
### (To be published)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| ROBERT KIRK COLLIER, JR., | \* | Special Master Oler |
| | \* | |
| Petitioner, | \* | Filed: August 22, 2018 |
| | \* | |
| v. | \* | Attorneys' Fees and Costs; |
| | \* | Reasonable Basis; Six Months Sequelae; |
| SECRETARY OF HEALTH AND | \* | Surgical Intervention. |
| HUMAN SERVICES, | \* | |
| | \* | |
| Respondent. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Randall G. Knutson*, Knutson & Casey Law Firm, Mankato, MN, for Petitioner.

*Althea Walker Davis*, U. S. Dep't of Justice, Washington, DC, for Respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

On January 4, 2017, Robert Kirk Collier, Jr. ("Petitioner") filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2]  Petitioner alleged that he suffered Guillain-Barré syndrome ("GBS") as a result of the influenza ("flu") vaccine administered on October 12, 2013.  Petition ("Pet."), ECF No. 1.  On January 25, 2018, Petitioner filed a Motion for Decision Dismissing Petition (ECF No. 27); a decision dismissing the petition for insufficient proof was issued on January 26, 2018.  ECF No. 28.  Judgment was entered on February 26, 2018.  ECF No. 30.

---

[1] Although this Decision has been formally designated "not to be published," it will nevertheless be posted on the Court of Federal Claims' website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the ruling will be available to anyone with access to the internet**. As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the Decision in its present form will be available. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

On March 16, 2018, Petitioner filed a Motion for Attorneys' Fees and Costs ("Fees App."). ECF No. 32.  Petitioner requests attorneys' fees in the amount of $17,891.00 and costs in the amount of $700.93, totaling $18,591.93.  *Id.* at 1.  In compliance with General Order No. 9, Petitioner submitted a statement representing that "Petitioner has not incurred any out-of-pocket costs in pursuing his claim.  All costs were incurred by Petitioner's attorney.  Furthermore, no fees have been paid by Petitioner to his attorney."  Fees App., ECF No. 32- 5.  Respondent opposes. For the reasons set forth below, Petitioner's motion for attorneys' fees and costs is denied.

## I.      Petitioner's Medical History

Petitioner received a flu vaccine on October 12, 2013.  Ex. 3.  On November 7, 2013, Petitioner visited Dunes Family Health complaining of urinary retention, which he stated had been intermittent for years.  Ex. 7 at 14-15.

On January 21, 2014, Petitioner went to the Emergency Room ("ER") at Lower Umpqua Hospital in Reedsport, Oregon.  He reported that yesterday (1/20/2014), he went for a walk and his hands felt cold and achy.  Ex. 4 at 1.  Petitioner reported that "today" (1/21/2014), he noticed a pins and needles sensation in his fingertips, and that his tongue felt swollen.  *Id.*  Petitioner was assessed as having oral candidiasis and possible Raynaud phenomenon.  *Id.* at 2.  He was directed to follow up in one to two weeks.  *Id.*

On January 23, 2014, Petitioner visited the Lower Umpqua Hospital Walk-In Clinic for a sore throat, difficulty swallowing, intermittent blurry vision and eye discomfort for the past two days, and paresthesias in both palms.  Ex. 5 at 1-2.  The doctor noted he had flu symptoms for 10 days and that those symptoms had ended four to five days ago.  *Id.* at 1.  Petitioner was assessed as having Dysphonia/hypernasality, and slight dehydration.  *Id.* at 4.  He was scheduled for a consult and encouraged to push fluids.  *Id.*

On January 24, 2014, Petitioner had an appointment with Dr. Douglas Crane at Bay Area Hospital in Coos Bay, Oregon.  During this visit, Petitioner described symptoms which included numbness in his hands and throat, along with weakness and discoordination in his hands.  Ex. 6 at 1.  He also described an inability to swallow.  *Id.*  Dr. Crane noted no biceps reflex and no patellar or ankle reflexes either.  *Id.* at 2.  Dr. Crane suspected bulbar palsy with GBS as a differential diagnosis.  *Id.*  He ordered a lumbar puncture, which revealed a protein level of 57 (normal range is between 15 and 45).  *Id.* at 3.  Petitioner remained at Bay Area Hospital until January 26, 2014. Dr. Crane summarized Petitioner's stay Bay Area Hospital in a section entitled "Hospital Course". In it he noted,

> He was set up for a PEG tube for feeding purposes due to his complete inability to swallow.  However, yesterday afternoon it was felt that he might be improving a bit and we held off until today. Today we looked the situation over, and I felt that he was either going to end up set up to OHSU or show some improvement and so I have held off yet another day on placing a PEG tube. He realizes he could end up on the vent on the way up to OHSU and that if he does it could be a prolonged ventilation indeed.  He

> also realizes that he is probably going to need some sort of tube feeding.  I did place a Kao feeding tube, and I felt like he had a wire curled up in his nasopharynx (which indeed he may have) and this was removed due to severe discomfort.  Another chance at a Dobbhoff or KAO tube may be appropriate.

Ex. 6 at 1.

Petitioner was transferred to Oregon Health and Science University (OHSU) on January 26, 2014.  His doctors noted garbled speech, weak limbs, ataxic gait, inability to swallow sputum, and "no real nutrition since [W]ednesday." Ex. 9 at 66.  On January 27, 2014, a neurology progress note stated, "[o]f note, he had a flu like illness about a week before onset of his symptoms."  Ex. 10 at 36.  On January 31, 2014, Petitioner told his doctor that "[h]is symptoms started on 1/21/14, when he first noticed tingling in his palms, followed by dysarthrtia, dysphagia, weakness in his upper extremities, and double vision…."  Id. at 3.  Petitioner used a feeding tube for nutrition and a Dobhoff tube to clear his secretions.  Id. at 37.  Petitioner began IVIG treatment on January 26, 2014 and his doctor noted in the discharge summary: "Patient was started on a 5 day course of IVIG (30g x 5 doses), with significant clinical improvement."  Id. at 4.

Upon discharge from OHSU on January 31, 2014, Dr. Yadav noted:

> On day of discharge, patient's neurologic exam was close to baseline, with resolved dysarthria, full neck and upper extremity strength, resolved tingling in his hands, and return of his reflexes.  Patient only notes some double vision/blurred vision when glancing left, and some retrorbital eye pain.  Overall, given significant recovery on IVIG, patient has an excellent prognosis and should recover to/near baseline.

Id.

Petitioner met with Marlena Cobb (an occupational therapist) on January 31, 2014; Ms. Cobb noted he had "almost 100% recovered and is now independent with functional mobility and ADLS [activities of daily living], and has no need for continued acute occupational therapy services at this time. Will sign off."  Id. at 135.  The record also reflects Petitioner stated, "I'm perfectly fine now! I have been walking on my own (wife agrees with this)."  Id. at 136.

Petitioner did not have another medical appointment until his visit with Dr. Audrey Shank on June 14, 2014.  During this visit, he complained of panic attacks and told Dr. Shank that he wanted to start taking Effexor again. Ex. 8 at 87.  Dr. Shank took a fairly extensive history.  The "history of present illness" section of this record states, in part:

> Recently, he was asked to come out of retirement to do engineering work back in Reno, Nevada where he is from and he has found that he is starting to have panic attacks on a regular basis, that he is not sleeping well, he is feeling very anxious and he is interested in restarting Effexor.  When told that it would take several weeks for this to completely kick in he says that

he understands that, but he felt much better while he was taking Effexor and despite the fact that this job only has 4 more weeks with it, he is interested in restarting it and staying on it for awhile.  The patient states that he just recently came back from Reno and while he was there for the week he was unable to sleep….

*Id.*  Dr. Shank noted under "past medical history" that Petitioner spent one week at OHSU "and despite the nature of this disease, he has absolutely no neurologic sequelae and has completely recovered from his encounter with Guillain-Barre." *Id.*

During a maintenance exam on June 29, 2015, Petitioner reported that "he feels great, %100, he has never felt better." Ex. 7 at 12.  His physician noted that "[l]ast year he developed GBS, he was treated at OHSU for a week and has had complete recovery.  He has not had [follow up]." *Id.*

## II.    Procedural History

Petitioner filed a claim for compensation on January 4, 2017, alleging that the flu vaccine he received on October 12, 2013 caused him to develop GBS.  Pet. at 2.  Petitioner further alleged that he "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine" and that "he continues to have severe medical issues as a result of Guillain-Barre Syndrome caused by the Influenza vaccine, and that he will require substantial future medical care and monitoring." *Id.*  Petitioner filed his birth certificate (Ex. 1), his affidavit (Ex. 2), his vaccination record (Ex. 3), and some of his medical records (Exs. 4 - 6) on January 11, 2017.  He filed the remainder of his medical records (Exs. 7-13) and a Statement of Completion (ECF No. 10) on March 21, 2017.

Thereafter, Respondent filed a Rule 4(c) Report on August 2, 2017, contesting Petitioner's right to damages, and requesting dismissal of the claim.  *See* Respondent's Report, ECF No. 15.  Specifically, Respondent stated that (1) the time between Petitioner's vaccine date and onset of symptoms is outside the medically-reasonable timeframe to establish causation, (2) Petitioner's prior history of flu-like symptoms to include fever, severe sore throat, nasal congestion, runny nose, sinus pain, and difficulty swallowing in the weeks prior to onset of his GBS suggests a possible alternate causation, and (3) Petitioner did not suffer the residual effects of his vaccine injury for more than six months.  *Id.* at 9-10.

Petitioner filed a Response to Respondent's Rule 4(c) Report ("Pet'r's Rule 4(c) Resp.") on September 5, 2017, conceding that Petitioner has not had GBS sequelae for more than six months.  "Petitioner Kirk Collier has not had symptoms for 6 months or more.  He has completely recovered from his near fatal bout with GBS, and has no residual effects at this time." Pet'r's Rule 4(c) Resp. at 1.  Instead, Petitioner argues that the procedures he underwent during his treatment for GBS constitute "surgical intervention" under the Act.  *Id.*  Petitioner discusses some of these procedures; he concedes that he did not have a percutaneous endoscopic gastrostomy (PEG) tube placed.  *Id.* at 2.  He states that a feeding tube was placed instead, but that it was inserted improperly.  *Id.*  Petitioner goes on to state, "[i]t is unclear from the records how [the feeding tube] was specifically removed, and whether a surgical procedure was undertaken to complete the

removal."[3]  *Id.*  Petitioner states that the medical records indicate: (1) a percutaneous endoscopic gastrostomy ("PEG") tube was not placed, (2) the yankauer tube was placed through the mouth as opposed to through a tracheotomy hole, and (3) both mechanical ventilation[4] and a nasal endoscopy were performed.  *Id.*  In sum, Petitioner argues that, either individually or as a whole, the procedures of mechanical ventilation, feeding tubes, yankauer suction tubes, and a nasal endoscopy constitute surgical intervention.  *Id.*

On December 19, 2017, I held a status conference with both parties.  Petitioner's counsel requested that I make a determination as to whether Petitioner underwent a surgical intervention under 42 U.S.C. § 300aa-11(c)(1)(D) based on the submissions I had received to date.  I gave the parties a deadline to file briefs addressing whether Petitioner's procedures constitute a surgical intervention.  *See* Order, dated December 19, 2017 (ECF No. 24).  I directed both sides to address several of my questions in their briefs.  Additionally, I asked the parties to discuss whether they agreed to adopt the definition of surgical intervention as articulated in *Spooner v. Sec'y of Health & Human Servs.*, No. 13-159V, 2014 WL 504728, at *10 (Fed. Cl. Spec. Mstr. Jan. 16, 2014), or to provide either a stipulated definition by the parties or each party's own definition with supporting materials.  Petitioner instead filed a status report on January 5, 2018, informing me of his intent to prepare a motion to dismiss and acknowledging that he did not undergo a surgical intervention under the Act.  ECF No. 26.  On January 25, 2018, Petitioner filed a Motion for Decision Dismissing Petition.  ECF No. 27.  I dismissed the petition for insufficient proof (ECF No. 28) and Judgment was entered on February 26, 2018.  ECF No. 30.

Petitioner filed the present motion for attorneys' fees and costs on March 16, 2018.  ECF No. 32.  Respondent responded to Petitioner's motion, arguing that because "[P]etitioner has failed to establish a reasonable basis for his claim," he is not eligible for an award of attorney's fees and costs.  Respondent's Response at 7, ECF No. 33.  On April 3, 2018, Petitioner replied to Respondent, stating that despite this Court's appropriate dismissal of his claim, attorneys' fees should be awarded because the Petition was "brought in good faith with a well-deserved expectation of compensation".  Petitioner's Reply (Pet'r's Reply) at 6, ECF No. 34.

## III.    Parties' Arguments

### A.  Petitioner's Arguments for Reasonable Basis

---

[3] I note that in the records from Bay Area Hospital (filed on January 11, 2017) Dr. Barbara Michaelis writes under "Findings": "Patient's feeding tube lies with its tip at the right lung base.  It is NOT in appropriate position.  I called the floor but received no answer, so found patient in his room and removed the tube myself."  *See* Ex. 6 at 6.  The removal of this tube was clearly not surgical in nature.

[4] Although Petitioner references mechanical ventilation several times in his filings, after my careful review of the medical records, it does not appear that Petitioner was ever placed on a ventilator.  *See* Ex. 9 at 121 (Emergency Airlift from Bay Area Hospital to Oregon Health and Science University (OHSU) where under "Airway" the record states, "assessed with no abnormalities."); Ex. 10 at 53, 58 (while at OHSU on 1/26/2014, medical record indicates "[b]reathing comfortably and sating well on RA." [room air]); Ex. 10 at 45 (while at OHSU on 1/27/2014, Petitioner is described as "breathing comfortably on RA"); Ex. 10 at 25, 30 (while at OHSU on 1/28/2014, records state "O2 Delivery Device: None (room air)"); Ex. 10 at 20 (while at OHSU on 1/29/2014, records state "O2 Delivery Device: None (room air)"); Ex. 10 at 8 (while at OHSU on 1/30/2014, records state "O2 Delivery Device: None (room air)").

Petitioner filed the present motion for attorneys' fees and costs on March 16, 2018. ECF No. 32. On April 3, 2018, Petitioner replied to Respondent's response, stating that despite this Court's appropriate dismissal of Petitioner's claim, an award for attorneys' fees should be made. Pet'r's Reply at 6, ECF No. 34.

Petitioner emphasizes that while his claim has been dismissed, attorneys' fee awards have still been found appropriate in similar instances. *Id.* Petitioner argues that interim fees can be awarded before any actual determination on compensation is made because the Vaccine Program does not require a prevailing party for an award. *Id.* at 2. Petitioner states that neither a special master nor Respondent questioned reasonable basis during the proceedings, since it was clear Petitioner suffered from GBS.[5] *Id.* at 2-3.

Petitioner explained that his counsel had: (1) a "legitimate expectation that the symptoms would last more than 6 months" and (2) a belief from a review of the record that Petitioner had operative procedures. *Id.* at 3. Petitioner argues that there are no medical records for the timeframe surrounding six months after the vaccine, so the gap in the history between January 2014 and June 2014 did not show when his symptoms ended. *Id.* Petitioner mentions that "when it became an issue for the Court, Petitioner searched for records in this 4.5 month treatment gap," and realized that while he could not prove that he suffered symptoms for more than six months, he still believed that he underwent surgical intervention from the feeding tubes, yankauer tubes, PEG tube, mechanical ventilation, and/or nasal endoscopy. *Id* at 4-6. Petitioner could not prove the requirements of § 11(c)(1)(D). *Id.* at 3. He dismissed the case and now argues that the petition was "brought in good faith with a well-deserved expectation of compensation." *Id.*

## B. Respondent's Arguments against Reasonable Basis

On March 27, 2018, Respondent responded to Petitioner's motion for attorneys' fees and costs. (Resp't's Resp. to Fees App., ECF No. 33). Respondent argued against an award of attorneys' fees and costs because "[P]etitioner has failed to establish a reasonable basis for his claim." *Id.*

Respondent argues that for reasonable basis to exist, a claim must have supporting medical records or medical opinion. *Id.* at 4 (citing *Everett v. Sec'y of Health & Human Servs.*, No. 91-1115V, 1992 WL 35863, at *2 (Cl. Ct. Spec. Mstr. Feb 7, 1992)). Here, Respondent argues that more than 14 weeks from vaccination to onset is too long to infer causation, Petitioner did not experience more than six months of sequelae, even though his petition asserted (incorrectly) that he had, and Petitioner did not undergo a surgical intervention. Resp't's Resp. to Fees App. at 6-7.

Specifically, Respondent emphasizes that Petitioner's counsel should have used his judgment to determine whether there were reasonable underpinnings before accepting the case. *Id.* at 5. Respondent argues that there was never evidentiary support for Petitioner to bring this

---

[5] This statement is inaccurate. In his Rule 4(c) Report, Respondent stated that he "reserves the right to challenge whether there was reasonable basis for petitioner's claim in this case." *See* Rule 4(c) Report at 9, n.2; Respondent also raised reasonable basis during the status conference on December 18, 2017. *See* Order, dated December 19, 2017 (ECF No. 24) (summarizing Status Conference of December 18, 2017, "Respondent also questions reasonable basis for Petitioner's claim in this case").

claim, given that the medical records never supported Petitioner having suffered from GBS for more than six months or that he would require future medical care. *Id.* at 6. Respondent mentions that Petitioner never provided an expert opinion when his medical records failed to support the claim and could not prove that he underwent surgical intervention. Therefore, Respondent concludes that Petitioner's counsel is not eligible for an award of attorneys' fees and costs because there was never reasonable basis to satisfy the Act's standard. *Id.* at 7.

## IV.    Applicable Law

The Vaccine Act's severity requirement specifies that in order to receive compensation under the Vaccine Program, a Petitioner must have: "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or died from the administration of the vaccine, or suffered such illness, disability, injury, or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention[.]"  § 11(c)(1)(D).

In *Spooner*, 2014 WL 504728, the Special Master defined "surgical intervention" as "the treatment of a disease, injury, and deformity with instruments or by the hands of a surgeon to improve health or alter the course of a disease." *Id.* at 10.  In *Spooner*, the Special Master found that a lumbar puncture and IVIG treatment do not constitute a surgical intervention for purposes of the Vaccine Act's severity requirement.

Under the Vaccine Act, an award of reasonable attorneys' fees and costs is mandatory where a Petitioner is awarded compensation; where compensation is denied, as it was in this case, the special master must first determine whether the petition was brought in good faith and whether the claim had a reasonable basis.  § 15(e)(1).

The good faith requirement is met through a subjective inquiry.  *Di Roma v. Sec'y of Health & Human Servs.*, No. 90-3277, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993).  Such requirement is a "subjective standard that focuses upon whether [a] petitioner honestly believed he [or she] had a legitimate claim for compensation." *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007).  Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996).  Thus, so long as petitioner had an honest belief that his claim could succeed, the good faith requirement is satisfied.  *See Riley v. Sec'y of Health & Human Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

Regarding the reasonable basis requirement, it is incumbent on Petitioner to "affirmatively demonstrate a reasonable basis," which is an objective inquiry.  *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 297, 305 (2011); *Di Roma*, 1993 WL 496981, at *1.  When determining if a reasonable basis exists, many special masters and U.S. Court of Federal Claims judges employ a totality of the circumstances test.[6]  The factors to be considered under this test

---

[6] Multiple Judges at the U.S. Court of Federal Claims have affirmed instances when the special master employed this test or remanded a decision when the special master did not.  *Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 288 (2014); *Graham v. Sec'y of Health & Human Servs.*, 124 Fed. Cl. 574, 579 (2015); *Rehn v. Sec'y of*

may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, 2018 WL 3032395, at *7, _ Fed. Cl. _ (2018).   This "totality of the circumstances" approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Human Servs.*, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

The Federal Circuit has stated that reasonable basis "is an objective inquiry" and concluded that "counsel may not use [an] impending statute of limitations deadline to establish a reasonable basis for [appellant's] claim." *See Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017).  Further, an impending statute of limitations should not even be one of several factors the special master considers in her reasonable basis analysis.  "[T]he Federal Circuit forbade, altogether, the consideration of statutory limitations deadlines—and all conduct of counsel—in determining whether there was a reasonable basis for a claim." *Amankwaa*, 2018 WL 3032395, at *7.

Unlike the good faith inquiry, reasonable basis requires more than just Petitioners' belief in their claim.  *See Turner*, 2007 WL 4410030, at *6.  Instead, the claim must at least be supported by objective evidence -- medical records or medical opinion.  *Sharp-Roundtree v. Sec'y of Health & Human Servs.*, 2015 WL 12600336, at *3 (Fed. Cl. Spec. Mstr. Nov. 3, 2015).  The court expects the attorney to make a pre-filing inquiry into the claim to ensure that it has a reasonable basis.  *See Turner*, 2007 WL 4410030, at *6-7.  However, "special masters have historically been quite generous in finding reasonable basis for petitions."  *Turpin v. Sec'y of Health & Human Servs.*, 2005 WL 1026714, at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005); *see Turner*, 2007 WL 4410030, at *6-7.  Allowances have also been made for "skeletal" petitions, where reasonable basis is later reinforced with medical records and expert opinions.  *Turpin*, 2005 WL 1026714, at *2.

However, even if reasonable basis exists at the time the petition is filed, it "may later come into question if new evidence becomes available or the lack of supporting evidence becomes apparent."  *Chuisano*, 116 Fed. Cl. at 288; *see also Perreira v. Sec'y of Health & Human Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994) (affirming the special master's finding that reasonable basis existed until the evidentiary hearing); *Hamrick*, 2007 WL 4793152, at *4 (observing that "Petitioner's counsel must review periodically the evidence supporting [P]etitioner's claim").

## V.     Analysis

### A.  Good Faith

Petitioner is entitled to a presumption of good faith, and Respondent does not contest that the petition was filed in good faith. *Grice*, 36 Fed. Cl. at 121.  There is no evidence that this petition was brought in bad faith.  Thus, I find that the good faith requirement is satisfied.

### B.  Reasonable Basis for the Claims in the Petition

---

*Health & Human Servs.*, 126 Fed. Cl. 86, 91-92 (2016); *Allicock v. Sec'y of Health & Human Servs.*, 128 Fed. Cl. 724, 726 (2016); *Cottingham v. Sec'y of Health & Human Servs.*, 134 Fed. Cl. 567, 574 (2017).

The reasonable basis standard is objective and requires Petitioner to submit evidence in support of the petition.  The petition in this case alleges that Petitioner received the flu vaccine on October 12, 2013, and began to experience symptoms of what was later diagnosed as GBS on January 20, 2015[7].  Pet. at 1.  The petition states that Petitioner suffered GBS, and that his GBS was caused in fact by the flu vaccine.  *Id.* at 2.  The petition further alleges that Petitioner suffered the residual effects of his illness for more than six months, and further that he "continues to have severe medical issues" as of the date the petition was filed.  *Id.*  As discussed in further detail below, I do not find these claims articulated in the petition to be supported by objective evidence.

### 1.  Petitioner has not Presented Evidence of Causation

Petitioner has not presented evidence (medical records or medical opinion) that the flu vaccine he received on October 12, 2013 caused him to develop GBS on January 20, 2014.  None of Petitioner's treating physicians linked the flu vaccination to Petitioner's illness[8], and Petitioner did not file an expert report articulating a link between his vaccination and onset of GBS.  In fact, Petitioner experienced flu-like symptoms starting on approximately January 8-9, 2014, 11-12 days before he began to experience symptoms of GBS.  *See* Ex. 5 at 1 (where on January 23, 2014, doctor noted Petitioner had flu symptoms for 10 days, and those symptoms had ended four to five days ago).  On January 27, 2014 a neurology progress note states, "[o]f note, he had a flu like illness about a week before onset of his symptoms."  Ex. 10 at 33.  The records on this same date also state, "[o]f note, he reports a mild viral syndrome."  *Id.* at 41.  On January 31, 2014, the physician discharge summary states, "[h]e noted a mild viral syndrome with subjective fevers, sore throat, and congestion prior to onset of the symptoms above."  *Id.* at 3.

Under 42 C.F.R. § 100.3(a)(XIV)(D), in order to satisfy the Table requirement for GBS, vaccination to onset of symptoms must occur within three to 42 days.  Petitioner's symptoms began more than 14 weeks (101 days) after flu vaccine, and clearly fall outside of the Table.  In non-Table GBS claims, Special Masters have not awarded compensation when onset occurs more than two months after vaccination because it is not medically plausible for the immune response that is a central component of the autoimmune process resulting in GBS to take this long.  *See, e.g., Barone v. Sec'y of Health & Human Servs.*, No. 11-707V, 2014 WL 6834557, at *13 (Fed. Cl. Spec. Mstr. Nov. 12, 2014) (eight weeks is the longest reasonable timeframe for a flu/GBS injury); *De La Cruz v. Sec'y of Health & Human Servs.*, No. 17-783V, 2018 WL 945834, at *1 (Fed. Cl. Spec. Mstr. Jan. 23, 2013) (onset of GBS more than two months after flu vaccination is not compensable); *Corder v. Sec'y of Health & Human Servs.,* No. 08-228V, 2011 WL 2469736 (Fed. Cl. Spec. Mstr. May 31, 2011) (dismissing suit involving four-month onset of GBS after flu vaccination).  Fourteen weeks is well outside a temporally-appropriate onset window.  Such a temporal gap makes this claim unfeasible.

Unlike some cases where there is a dispute as to when symptoms began, the medical records as well as Petitioner's affidavit in this case make date of onset clear.  Indeed, Petitioner

---

[7] This appears to be a typo and should instead read, "January 20, 2014".

[8] Petitioner notes in his affidavit, "I was diagnosed with Guillain-Barre Syndrome at the hospital, and was told this was most likely from the Influenza (Alfuria) vaccination."  Ex. 2 at 1.  However, there is no reference in the medical records that any physician linked Petitioner's GBS to his flu vaccination.

has consistently maintained that he began to experience symptoms the day before he went into the ER on January 21, 2014. Petitioner possessed and filed portions of these medical records within days of filing his petition. No affidavit or other evidence has been filed indicating an earlier onset of symptoms. In fact, the petition itself makes clear that onset occurred on January 20, 2014. In short, the only evidence of onset in the record of this case indicates Petitioner's symptoms began on approximately January 20, 2014. Onset of symptoms on January 20, 2014, more than 14 weeks after vaccination, is too long an interval to be medically appropriate. Petitioner has not presented evidence that his flu vaccination caused him to develop GBS. There is no reasonable basis for the claim of causation-in-fact set out in the petition.

2. <u>Petitioner has not Presented Evidence that He Met the Six-Month Requirement</u>

In his Petition, Petitioner asserts that he "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine" and that "he continues to have severe medical issues as a result of Guillain-Barre Syndrome caused by the Influenza vaccine, and that he will require substantial future medical care and monitoring." Pet. at 2. There is no reasonable basis for these allegations.

Petitioner received the flu vaccine on October 12, 2013. OHSU discharged him on January 31, 2014, noting that his "neurologic exam was close to baseline, with resolved dysarthria, full neck and upper extremity strength, resolved tingling in his hands, and return of his reflexes." Ex. 10 at 4. Petitioner did note some double/blurred vision when glancing to the left, and some retrorbital eye pain at that time. His discharge note indicates that he has "an excellent prognosis" and "should recover to/near baseline." *Id.* On this same date, Ms. Cobb, an occupational therapist noted he has "almost 100% recovered and is now independent with functional mobility…." *Id.* at 135. Petitioner told Ms. Cobb, "I'm perfectly fine now! I have been walking on my own." *Id.* at 136. In sum, the medical records from his January 31, 2014 discharge indicate that Petitioner still had some sequelae from GBS, but that he had made a near-complete recovery.

Petitioner did not have another medical appointment until his visit with Dr. Shank on June 14, 2014. This appointment occurred approximately two months after the six-month clock would have run. During this visit, Petitioner discussed coming out of retirement and flying to and from Reno to perform his new job. Ex. 8 at 87. Dr. Shank referenced Petitioner's GBS, noting that "despite the nature of this disease, he has absolutely no neurologic sequelae and has completely recovered from his encounter with Guillain-Barre." *Id.*

Petitioner argues this gap in treatment appeared "odd". Pet'r's Reply at 3-4. He seems to argue that because "there simply are no medical records around the time of the running of the 6 months" (*id.* at 3), this fact is favorable to Petitioner's claim of reasonable basis. I do not agree. A gap in the medical records from date of discharge until the June 14, 2014 appointment suggests that Petitioner did not need medical care because he had made a complete recovery. The annotations in the records at the appointment that Petitioner had "absolutely no neurologic sequelae and has completely recovered" combined with discussion of his new work in Reno further support the fact that Petitioner recovered from GBS and did not experience six months of sequelae.

Further highlighting this point, the medical records from the June 29, 2015 appointment indicate that "[l]ast year [Petitioner] developed GBS, he was treated at OHSU for a week and has had complete recovery. He has not had [follow up]." Ex. 7 at 12. This reference to a complete recovery and lack of follow-up suggests that Petitioner has not been to see a doctor because he was not having any symptoms.

Even Petitioner's affidavit is silent on the duration of his symptoms. *See* Ex. 2. In his Response to the Respondent's Rule 4(c) Report, Petitioner conceded the lack of six months of sequelae, stating he "has not had symptoms for 6 months or more", and that he "has completely recovered from his near fatal bout with GBS, and has no residual effects at this time." Pet'r's Rule 4(c) Resp. at 1.

In sum, Petitioner has presented no evidence that he suffered six months of sequelae, and accordingly, there is no reasonable basis for this claim set out in the petition.

### 3. Petitioner did not Undergo a Surgical Intervention

Petitioner did not allege that he underwent a surgical intervention in the petition. Although conceding that he had not experienced six months of sequelae in his Response to the Rule 4(c) Report, Petitioner's position became that he had undergone procedures (PEG tube, feeding tubes, suction tubes, mechanical ventilation, and nasal endoscopy) that, either individually or as a whole, constituted surgical intervention. Because Petitioner could have amended his petition to advance this theory, I will analyze it. As discussed below, none of the procedures listed by Petitioner constitute "treatment of a disease, injury, and deformity with instruments or by the hands of a surgeon to improve health or alter the course of a disease", and thus are not a surgical intervention. *See Spooner*, 2014 WL 504728, at *10.

#### a. Feeding Tubes

Feeding tubes can either be passed through the nose or through the skin of the abdomen. A tube passed through the nose is inserted by the heath care provider and is non-surgical; feeding tubes (PEG tubes) passed through the abdomen require an incision.[9] Nasogastric tubes (a

---

[9] A PEG tube is placed by a doctor in the operating room.

The PEG tube is inserted using a telescopic instrument, called an endoscope. The endoscope is a small tube with a light and camera on the end that lets the Gastroenterologist see into the esophagus (food tube) and stomach. The endoscope allows the doctor to choose the best location in the stomach to place the PEG tube. Once the location is chosen, a small opening is made on the outside of abdomen into the stomach. After the opening is made, the top part of the PEG tube is pulled up out of the stomach through this opening. The top of the tube rests on the skin and the bottom part of the PEG, which is shaped like bulb, remains inside the stomach. This bulb shape anchors the tube in the stomach and prevents it from coming out.

*See* Percutaneous Endoscopic Gastrostomy (PEG) Tube, https://pedsurg.ucsf.edu/conditions--procedures/gastrostomy-tubes.aspx#a2 (last visited August 16, 2018).

Dobbhoff tube is an example) feed from the nose to the stomach, and nasojejunal tubes (Keofeed tube) pass from the nose to the small intestine.[10]

Petitioner's counsel stated in his response to Respondent's report that he "originally believed that Petitioner underwent a surgical procedure to place a PEG feeding tube." Pet'r's Rule 4(c) Resp. at 2.  After citing to medical records from Bay Area Hospital, however Petitioner conceded that the feeding tubes were placed non-invasively, as that Petitioner *never had* a PEG tube.  *Id.* at 2-3; Ex. 9 at 60.  In fact, a review of the medical records leaves no doubt that a PEG tube was *not* placed.

Dr. Crane summarized Petitioner's stay at Bay Area Hospital in a section entitled "Hospital Course".  In it he noted,

> He was set up for a PEG tube for feeding purposes due to his complete inability to swallow.  However, yesterday afternoon it was felt that he might be improving a bit and we held off until today.  Today we looked the situation over, and I felt that he was either going to end up set up to OHSU or show some improvement and so I have held off yet another day on placing a PEG tube.  He realizes he could end up on the vent on the way up to OHSU and that if he does it could be a prolonged ventilation indeed.  He also realizes that he is probably going to need some sort of tube feeding.  I did place a Kao feeding tube, and he felt like he had a wire curled up in his nasopharynx (which indeed he may have) and this was removed due to severe discomfort.  Another chance at a Dobbhoff or KAO tube may be appropriate.

Ex. 6 at 1.

Certainly, Petitioner's treating physicians thought about placing a PEG tube, but the records are clear that they did not.  A feeding tube placed through the nose (like a Dobbhoff tube or a Keofeed tube) does not constitute a surgical intervention.

### b.  Suctioning

In his Response to Respondent's Rule 4(c) Report, Petitioner asserts that on January 26, 2014, Petitioner's condition had deteriorated and "a procedure was undertaken to suction his sputum with a 'yankauer'."  Petitioner went on to state that "[a] 'yankauer' is a tube that is typically placed through a tracheotomy hole, but other times through the mouth.  In this case it was placed through the mouth."  Pet'r. Rule 4(c) Resp. at 2-3.

---

[10] A nasogastric tube is defined as "a flexible tube inserted through a nostril and into the stomach for instilling liquid foods or other substances, or for withdrawing gastric contents."  Dorland's at 1976.  *See also* MAYO CLINIC, *Home Enteral Nutrition*, https://www.mayoclinic.org/tests-procedures/home-enteral-nutrition/about/pac-20384955 (last visited August 16, 2018).

A yankauer suction device includes "an elongated suction tube having a suction tip at a distal end thereof, and a proximal end that is connectable to a suction source."[11]  The use of this device does not constitute surgery.  It can be used *during* surgery, but by itself does not constitute a surgical procedure.[12]

The medical records reference use of this device during Petitioner's airlift to OHSU.  "Vital signs remained stable throughout transport, with pt. self-suctioning mouth as needed for secretions."  Ex. 9 at 123.  While still a patient at Bay Area Hospital, the medical records note that Petitioner "has not been able to swallow his sputum, suctioning large amounts of thick greenish sputum himself with a yankauer."  *Id.* at 66.  Petitioner's use of a yankauer to suction his own secretions does not constitute a surgical intervention.

### c. Mechanical Ventilation[13]

Petitioner contended that he was placed on mechanical ventilation, but as noted in note 4, *supra*, the medical records do not support this assertion.  *Id.*  In fact, the records only state that mechanical ventilation *might* be needed: "Careful watch for respiratory insufficiency; check NIF [Negative Inspiratory Force] and Vital Capacity every six hours for impending neuromuscular respiratory failure and need for mechanical ventilation."  Ex. 10 at 69.  Because Petitioner was never placed on a ventilator, it is unnecessary to analyze whether this would constitute a surgical intervention.

### d. Nasal Endoscopy

"Endoscopy is a minimally invasive, diagnostic medical procedure. It is used to examine the interior surfaces of an organ or tissue and allows visualization of body cavities not possible by standard examination."[14]  A nasal endoscope is "a medical device consisting of a thin, rigid tube with fiberoptic cables for bringing in light.  The endoscope is then connected to a light source and

---

[11] YANKAUER SUCTION DEVICE WITH SLEEVE AND WIPER, U.S. Patent No. 7,625,207, at p. 1 (filed Dec. 15, 2006) (issued Dec. 1 2009).

[12] *See* '207 at 1 Patent:

> Various medical procedures require suctioning of a patient's mouth.  A typical situation is when oral care procedures are performed on an intubated patient.  Yankauer suction devices for this purpose are generally known and include an elongated suction tube connectable at one end to a suction source.  The other end includes a suction tip with one or more suction holes that is placed in the patient's mouth.  The conventional devices suction well and are relatively rigid to allow the clinician to reach remote areas of the mouth that require suctioning.

[13] Mechanical ventilation is a non-invasive procedure where "[t]he patient has a tube inserted through the nose or mouth into the trachea (windpipe) that is attached to the ventilator."  *See* VENTILATORY SUPPORT, CINCINNATI CHILDREN'S, https://www.cincinnatichildrens.org/health/v/vent (last visited on August 6, 2018).

[14] NASAL ENDOSCOPY, http://care.american-rhinologic.org/nasal_endoscopy (last visited on August 6, 2018).

a video camera to project magnified images on a screen. These endoscopic images can be captured and recorded for documentation for each patient. Because the endoscope is slender (only 2.7-4.0 mm in width), it may be passed through the nostril to examine the nasal passages, structures and sinuses."[15]  *Id.*

In his Status Report filed on January 5, 2018, Petitioner stated:

> A nasal endoscopy can be a surgical procedure, or non-surgical procedure, depending on what is done once the procedure begins. In Petitioner's case, the medical records do not provide insight as to whether it was surgical or non-surgical. However the billing records have coded it as CPT 31575 code. See Exhibit 14. That code is for "Endoscopy Procedures on the Larynx", a non-surgical code for nasal endoscopy. Based upon this coding, Petitioner did not have a surgical procedure.

ECF No. 26 at 1.

The medical records from OHSU reference the use of a nasal endoscope: "saw an ENT on Thursday 1/23/14 who noted that his soft palate was not moving on nasal endoscopy." Ex. 10 at 45. A nasal endoscopy is not surgery, but instead is a diagnostic tool. It does not constitute a surgical intervention.

### e. Petitioner Conceded that He did not Undergo a Surgical Intervention

On December 19, 2017, I held a status conference and ordered the parties to submit briefs on whether Petitioner's procedures constituted surgical intervention under the Act. ECF No. 24. Petitioner instead filed a status report where he conceded that "no operative procedure was undertaken on Petitioner due to his vaccination." ECF No. 26.

Petitioner has presented no evidence that he underwent a surgical intervention; accordingly, there is no reasonable basis for this allegation.

Further, to the extent that Petitioner filed his claim due to the approaching statute of limitations deadline (flu vaccine on October 12, 2013; symptoms began on January 20, 2014; petition filed on January 4, 2017), I do not find this resolves the case in Petitioner's favor. *Simmons* clearly states that: [a]lthough an impending statute of limitations deadline may relate to whether 'the petition was brought in good faith' by counsel, the deadline does not provide a reasonable basis for the merits of the petitioner's claim." *Simmons*, 875 F.3d at 636.

In summary, Petitioner has not established that he possessed a reasonable basis for the claims raised in the petition. His lack of evidence on causation-in-fact, to include the more than

---

[15] *See also*, MAYO CLINIC, *Nasal Polyps*, https://www.mayoclinic.org/diseases-conditions/nasal-polyps/diagnosis-treatment/drc-20351894 (last accessed August 17, 2018), describing nasal endoscopy procedure as follows: "A Narrow tube with a lighted magnifying lens or tiny camera (nasal endoscope) enables your doctor to perform a detailed examination inside your nose and sinuses. He or she inserts the endoscope into a nostril and guides it into your nasal cavity."

14-weeks between vaccination and onset of symptoms, the lack of six months of sequelae, and the absence of any surgical intervention during the course of his case, when considered together, mean that Petitioner did not have a reasonable basis to file his claim.

## VI.    Conclusion

Based on the foregoing, I hereby **DENY** Petitioner's Motion for Attorneys' Fees and Costs.  The clerk  shall enter judgment accordingly.[16]

**IT IS SO ORDERED.**

<u>s/ Katherine E. Oler</u>
Katherine E. Oler
Special Master

---

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the  right to seek review.